## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| SUZANNE MERRILL,<br>    *Plaintiff*, | |
| v. | No. 3:21-cv-551 (JAM) |
| FREDERICK L. HYMAN *et al.*,<br>    *Defendants*. | |

### RULING ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

Bob Merrill wrote the lyrics to a popular musical. But years ago, he signed away some of his future royalties to a producer named Eliot Hyman. Merrill's widow, the plaintiff Suzanne Merrill, regrets that deal and would like to terminate it. She believes that the Copyright Act lets her. But Hyman's heirs read the law differently.

I agree with the Hymans. Although Merrill may terminate her late husband's *licensing* deals, she has no right to cancel his *royalty* deals. And Bob Merrill's agreement with Hyman was only a royalty deal. I will therefore deny Merrill's motion for summary judgment and grant summary judgment to the Hymans.

### BACKGROUND

Bob Merrill wrote and copyrighted the lyrics to the famous Broadway musical *Funny Girl*. In November 1963, Merrill and his coauthors (the book writer and composer) struck a deal with a company to produce the musical.[1] The production company got "the exclusive right to produce the Play" in the United States and Canada.[2] In exchange, it promised Merrill and his coauthors various types of royalties. For example, Merrill would get 2½–3% of gross box office receipts, 19½% of the profits from the original cast album, and 20% of book sales.[3]

---

[1] Doc. #37-1.
[2] *Id.* at 3.
[3] *Id.* at 12–13.

In December 1963, Merrill decided to swap some of his future royalties for immediate cash. He signed a contract with Eliot Hyman, an executive at the production company. Under this December contract, Hyman gave Merrill $82,500. In return, Merrill promised Hyman "an undivided two-thirds … interest in … his right to receive such royalties, percentage compensation, rights and other compensation, including, but not limited to, all compensation derived from any source whatever in and in connection with 'Funny Girl.'"[4] But Merrill "reserve[d] to himself … all royalties and proceeds … reserved by [him] under the [November contract with the production company]."[5] For example, he was not giving away any royalties from the radio rights to his songs—just royalties from the full musical.

The contract did cover royalties from other theater companies who wanted to put on the show.[6] And three years later, the *Funny Girl* creators decided to tap that market. They signed a deal with the Tams-Witmark Music Library. Tams got the right to sell licenses to produce *Funny Girl*. It would collect royalties, take a cut, then pass the rest back to the creators.[7] Merrill's coauthors would each get a 12⅓% share of the royalties. But thanks to the December contract, Merrill would get only a third of that—a 4⅛% share—while Hyman would get the remaining 8⅔%.[8]

Fast forward to 2015. Merrill and Hyman were long dead. Their families were still getting royalties from Tams. But Merrill's wife Suzanne wanted to cut the Hymans out. So she decided to "terminate[]" the December agreement, which she claimed she could do under federal

---

[4] Doc. #37-2 at 2–3.
[5] *Id.* at 4.
[6] *Id.* at 3.
[7] Doc. #22-1 at 17–22.
[8] *Id.* at 22.

copyright law.[9] She asked Tams to redirect the Hymans' royalties to her.[10] The Hymans objected. Tams is now holding the disputed royalties in escrow.[11]

To settle the issue, Merrill and the Hymans have sued each other. Merrill seeks a declaratory judgment that she has validly terminated the December contract.[12] The Hymans have countersued, claiming that Merrill breached the December contract (Count One) and tortiously interfered with their contract with Tams (Count Two).[13] They also seek a declaratory judgment that the December contract cannot be terminated (Count Three) and an injunction ordering Merrill to stop interfering with their royalties (Count Four).[14] The parties have cross-moved for summary judgment.[15]

<h3 align="center">DISCUSSION</h3>

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide whether those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide whether there are enough facts that remain

---

[9] *Id.* at 11.
[10] Doc. #37-3.
[11] Doc. #43-2 at 6–12.
[12] Doc. #22 at 25–27.
[13] Doc. #26 at 6–9.
[14] *Id.* at 9–11.
[15] Docs. #32, #35.

in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).[16]

Merrill would like to terminate her late husband's contract. The federal Copyright Act indeed gives authors a "termination" right. The right, as relevant here, kicks in 56 years after the author has registered a copyright. He (or his heirs) may then revoke any "transfer or license" of the copyright. 17 U.S.C. § 304(c).

But this termination right does not help Merrill, because her husband did not transfer or license his copyright to Hyman.[17] Under the Copyright Act, a lyricist gets five exclusive rights: the rights to sell, copy, adapt, perform, and display his lyrics. 17 U.S.C. § 106. He gets these rights simply because he wrote the lyrics. § 201(a). But he can then "transfer" those rights to someone else. § 201(d). Or he can grant a "license" to his work, which lets the licensee "use the copyrighted material." *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007).

In the December contract with Hyman, Merrill did neither. The contract nowhere says that Hyman could sell, copy, adapt, perform, or display the lyrics. Instead, the contract gives Hyman a financial right: if Merrill transfers or licenses his lyrics in return for royalties, then Hyman gets a cut.

But royalties are "[n]otably absent from the Copyright Act's exclusive sub-bundle of five rights." *Rodrigue v. Rodrigue*, 218 F.3d 432, 440 (5th Cir. 2000). So "the right to receive royalties is not a copyright interest." *Hayes v. Carlin Am., Inc.*, 168 F. Supp. 2d 154, 161 (S.D.N.Y. 2001). Thus, any "agreement concerning royalties does not constitute a transfer of copyright ownership within the meaning of the Copyright Act." *Big E. Ent., Inc. v. Zomba*

---

[16] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

[17] The Hymans allege that even if Merrill had sold Hyman a copyright, the deal could not be terminated because the lyrics "constitute a 'Work for Hire.'" Doc. #26 at 9 (¶ 19a). Given my ruling, I need not decide this issue.

*Enters., Inc*, 453 F. Supp. 2d 788, 798 (S.D.N.Y. 2006), *aff'd on other grounds*, 259 F. App'x

413 (2d Cir. 2008). When Merrill sold some of his future royalties to Hyman, he "did not transfer

any interest in a copyright or in any of the exclusive rights comprised in a copyright." *Broad.*

*Music, Inc. v. Hirsch*, 104 F.3d 1163, 1166 (9th Cir. 1997).

 Merrill seems to agree that if her husband had promised Hyman merely royalties, then

she cannot cancel the contract. She argues, however, that her husband really sold Hyman a

copyright interest. She reasons that her husband promised Hyman a share of his "royalties,

percentage compensation, *rights* and other compensation.'"[18] She argues that by "rights," her

husband meant "copyright."

 But three parts of the contract refute this interpretation. First, the catchall term "other

compensation" would make little sense if "rights" meant "copyright." Second, the contract states

that the "rights" Merrill is selling are those that he "is to receive" under "certain agreements with

[the production company]."[19] That does not cover Merrill's copyright: He did not get his

copyright from the production company. He got it by law because he wrote the lyrics.

 But most importantly, the contract simply never identifies a right under the Copyright Act

that Hyman has bought. A true copyright deal would. Consider the production contract, which

gives "the Producer … the exclusive right to produce the Play on the speaking stage"; or the

Tams-Witmark deal, which gives Tams "the exclusive license for sub-licensing all stage

presentations of the PLAY in the immediate presence of an audience."[20] The Hyman contract has

no similar language. It is unambiguously not a copyright deal.

---

[18] Doc. #37-2 at 2 (emphasis added); *see* Doc. #32-1 at 8–12.
[19] Doc. #37-2 at 2.
[20] Doc. #37-1 at 3; Doc. #22-1 at 19.

Merrill has a second argument. Three years after Hyman signed the contract with Merrill, he declared in the Tams-Witmark contract that he had a "two-thirds interest in the lyrics of the PLAY."[21] Merrill takes this as a concession that Hyman owned the copyright. She also points out that Hyman agreed to indemnify Tams for copyright infringement. He would not have done that, she argues, unless he held the copyright.[22]

I do not agree. In context, Hyman was using "interest" as a shorthand for his "interest in the royalties from the lyrics." And he might have indemnified Tams simply because he was a main beneficiary of the copyright. In any case, if Hyman thought that he owned the copyright, he was mistaken. The December contract makes it clear that he did not. And it is the words of the December contract that control, not speculations about what Hyman thought the contract meant three years later.

I will therefore grant summary judgment to the Hymans on their claims for declaratory judgment, breach of contract, and a permanent injunction. Although they also seek summary judgment on their tortious interference claim, I will dismiss that claim as moot in light of the Hymans' agreement at oral argument that their only damages are the royalties sitting in Tams' escrow account and for which they will be made whole by virtue of my ruling with respect to the other claims.

## CONCLUSION

The Court DENIES Merrill's motion for summary judgment (Doc. #32). The Court GRANTS the Hymans' motion for summary judgment (Doc. #35) as to their claims for declaratory relief, breach of contract, and permanent injunctive relief. Merrill shall forthwith advise Tams of this Court's ruling and revoke her termination notice and instruct Tams to release

---

[21] Doc. #22-1 at 18.
[22] Doc. #32-1 at 14–15.

and resume royalty payments to the Hymans. The Hymans' remaining claim for tortious interference is DISMISSED as moot. In addition, in light of his death, the Court GRANTS the unopposed motion to dismiss (Doc. #34) all claims against the defendant Frederick L. Hyman. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 20th day of October 2022.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge